No. 95-067

IN THE SUPREME COURT OF THE STATE OF MONTANA

1996

STATE OF MONTANA,

Plaintiff and Respondent,

v.

AARON D. ROMERO,

Defendant and Appellant.

APPEAL FROM: District Court of the Thirteenth Judicial District,
In and for the County of Big Horn,
The Hon. Maurice R. Colberg, Jr., Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Jack E. Sands, Billings, Montana

For Respondent:

Joseph P. Mazurek, Attorney General, Cregg Coughlin,
Assistant Attorney General, Helena, Montana;
Christine A. Cook, County Attorney, Curtis L.
Bevolden, Deputy Big Horn County Attorney, Hardin,
Montana

FILED

Filed: NOV 06 1996

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

Submitted on Briefs: April 11, 1996

Decided: November 6, 1996

Clerk

Justice James C. Nelson delivered the Opinion of the Court.

Aaron D. Romero (Romero) appeals from the judgment entered by the Thirteenth Judicial District Court, Big Horn County, finding him guilty of wasting or abandoning the carcass of an antelope in the field, a misdemeanor, hunting elk while privileges are suspended, a misdemeanor, hunting bear while privileges are suspended, a misdemeanor, and hunting antelope while privileges are suspended, a misdemeanor. We affirm.

## ISSUES

1. Did the District Court err by denying Romero's motion to dismiss the State's appeal from Justice Court?

2. Did the District Court deny Romero his right to a speedy trial?

3. Did the District Court err in denying Romero's motion to dismiss based on his claim of outrageous government conduct?

4. Did the District Court abuse its discretion in denying Romero's motion to dismiss based on an alleged discovery violation?

5. Did the District Court abuse its discretion when it denied Romero's motion to exclude testimony of Officer Long based on the State's refusal to produce Long's file?

6. Did the District Court abuse its discretion in denying Romero's motion to prohibit the State from introducing exhibits at trial based on an alleged discovery violation?

7. Did the District Court err in denying Romero's motion for a mistrial or dismissal of the charges based on an alleged discovery violation?

2

8. Did the District Court err in permitting the State to amend the citations after trial had started?

## BACKGROUND

As part of its efforts to curb criminal trafficking of wildlife, the criminal investigation section of the Montana Department of Fish, Wildlife & Parks assigned Officer Long (Long) to investigate illegal guided hunts on or near the Crow Indian Reservation. Long posed as a Great Falls businessman and met with William Hugs (Hugs) at a Billings taxidermy shop where he purchased a live bear cub from Hugs. Long also set up guided hunts on the Crow Reservation for bear, deer, and antelope. At that time, Long focused his investigations on Hugs.

On April 17, 1993, Hugs took Long to hunt with Romero at a lake near Fort Smith. Romero supplied the boat. The group hunted the water's edge where Romero claimed to have killed bears previously, but they did not find any game that morning. That afternoon, the group went "four-wheeling," but again saw no game.

On May 8, 1993, Hugs, Long, and Romero used Romero's boat to hunt the same lake shore they had hunted in April. They spotted a black bear near the shore; both Long and Hugs shot at it but did not kill the bear. Romero remarked that he was about to get out his gun to help kill the bear, but did not take a shot. Shortly thereafter, Hugs instructed Long to kill a mule dear near the shore and leave it for bear bait. In the afternoon, the party hunted from Long's vehicle in the Pryor Mountains. Hugs and Romero saw elk and hunted them on foot because Long said he did not want to

3

hunt them. However, Long watched Romero and Hugs stalk and shoot at the elk, killing one and wounding another. Romero and Hugs told Long to leave the front quarter of the elk because it did not have enough meat to warrant the trouble of packing it out with them. The following morning, the party returned to the site of the elk kill to see if any bear were feeding on the carcass. Although they did not see a bear at the carcass, they saw a cinnamon black bear on a nearby hill and shot at it but missed.

In August of 1993, the Department of Fish, Wildlife & Parks charged Romero with the following five misdemeanor fish and game violations: hunting elk while privileges were suspended in violation of § 87-1-102(f), MCA; hunting bear while privileges were suspended in violation of § 87-1-102(f), MCA; wasting or abandoning the carcass of an antelope doe in violation of § 87-3-102, MCA; hunting antelope while hunting privileges were suspended in violation of § 87-1-102(f), MCA; and wasting or abandoning part or parts of a big game animal, a bull elk, in violation of § 87-3-102, MCA. At the Justice Court trial, Romero moved to dismiss, claiming entrapment, outrageous government conduct, and failure to provide exculpatory evidence. The State had not produced the videotape of the May 9, 1993 hunt because Long was still undercover and the tape could have jeopardized his investigations and his safety. Based on a written stipulation between Romero and the State, the State edited the tape to obscure Long's identity. Romero moved to dismiss the case in part because he was displeased with the manner in which the State edited the tape. On November 30, 1993, the

4

Justice Court heard Romero's motion, cleared the courtroom, and viewed the videotape. In response to Romero's motion to dismiss, the State told the Justice Court that it would neither concur in nor oppose the motion. Therefore, the Justice Court dismissed the case.

The State immediately appealed to the District Court. On February 3, 1994, Romero moved to dismiss the appeal before the District Court because the State had not opposed the motion in Justice Court. In an order dated April 6, 1994, the District Court denied Romero's motion to dismiss the appeal.

Following the March 28, 1994 omnibus hearing, Romero moved to dismiss the charges on grounds of lack of a speedy trial, outrageous government conduct, entrapment, and failure to provide exculpatory evidence. The District Court heard the motions on April 25, 1994 and May 10, 1994. At the conclusion of the hearing on May 10, 1994, the State requested a transcript of the proceeding which was not prepared until August 1994. The District Court gave Romero until September 20, 1994, to respond. On November 3, 1994, the District Court denied Romero's motions to dismiss and set trial for November 28, 1994. Following three days of trial, a jury found Romero guilty of four of the five misdemeanor fish and game charges. The District Court sentenced Romero to a term of imprisonment for each count, but suspended the prison sentences on the condition that he pay a fine. The District Court further suspended Romero's hunting, fishing, and trapping privileges for three years.

DISCUSSION

1. Did the District Court err by denying Romero's motion to dismiss the State's appeal from Justice Court?

Romero claims that §§ 46-17-311 and 46-20-103, MCA, limit the State's right to appeal from a justice court decision. Specifically, Romero's argument is three-fold. First, he argues that the State lost its statutory right to appeal from the order dismissing the charges when it did not object to Romero's motion to dismiss. Second, he argues that the State is precluded from appealing the Justice Court order because the State failed to preserve its objection in Justice Court. Third, he argues that the District Court should have granted the motion to dismiss under the doctrine of "invited error." The State counters that Romero's claims are without merit and that the District Court properly denied Romero's motion to dismiss the appeal. The State contends that its statutory rights to appeal and to a district court trial de novo are clearly defined and may not be restricted.

A district court's denial of a motion to dismiss is a legal issue that we review to determine whether the district court's interpretation of the law was correct. State v. Bullock (1995), 272 Mont. 361, 368, 901 P.2d 61, 66.

Article VII, Section 4(2) of the Montana Constitution provides that the district court "shall hear appeals from inferior courts as trials anew unless otherwise provided by law." Section 46-17-311, MCA, provides for appeals of criminal cases arising in justice court. Section 46-17-311, MCA, sets forth the following:

6

**Appeal from justices', municipal, and city courts.**
(1) Except for cases in which legal issues are preserved for appeal pursuant to 46-12-204, all cases on appeal from a justice's or city court must be tried anew in the district court . . . .
   (2) The defendant may appeal to the district court by filing written notice of intention to appeal within 10 days after a judgment is rendered following trial. In the case of an appeal by the prosecution, the notice must be filed within 10 days of the date the order complained of is given. The prosecution may only appeal in the cases provided for in 46-20-103.

Section 46-20-103, MCA, governs the scope of appeal from justice court and provides the following:

**Scope of appeal by state.** (1) Except as otherwise specifically authorized, the state may not appeal in a criminal case.
   (2) The state may appeal from any court order or judgment the substantive effect of which results in:
(a) dismissing a case . . . .

In State v. Kesler (1987), 228 Mont. 242, 741 P.2d 791, this Court construed both § 46-17-311, MCA, and § 46-20-103, MCA. In Kesler, the appellant argued that the statutes were ambiguous as to whether they require the district court to conduct a trial de novo. Kesler, 741 P.2d at 793. We noted that when the legislature amended § 46-17-311, MCA, it intended to overrule our decision in State v. Sanchez (1980), 187 Mont. 434, 610 P.2d 162, wherein we held that the State has no right to appeal the final decision of a justice court in a criminal case. Kesler, 741 P.2d at 793. Therefore, in overruling Sanchez, the legislature specifically provided for the State to appeal from a decision in justice court and provided that all appeals from justice court require a trial de novo in district court. Kesler, 741 P.2d at 793.

In State v. Yarns (1992), 252 Mont. 45, 826 P.2d 543, the State contended that the district court exceeded its constitutional and statutory authority by reviewing the justice court's order and remanding the case for trial, rather than by conducting its own trial de novo. Yarns, 826 P.2d at 545. Citing Article VII, Section 4(2) of the Montana Constitution and §§ 46-17-311 and 46-20-103, MCA, this Court stated that "a district court does not have appellate jurisdiction to review a justice court order suppressing evidence and that the clear legislative intent of § 46-17-311, MCA, is to require a trial *de novo* on all appeals from justice court." Yarns, 826 P.2d at 545.

In the instant case, the District Court correctly interpreted § 46-20-103, MCA, to allow the State to appeal from the Justice Court's order which resulted in dismissal of the case. Neither § 46-17-311, MCA, nor § 46-20-103, MCA, requires the State to object to a defendant's motion to dismiss and we therefore decline to insert such a requirement where the legislature saw fit to leave that requirement out. The statutory language is clear.

However, Romero also argues that the State did not preserve its right to appeal because it did not object to Romero's motion to dismiss. The State counters that there is no record in justice court in which to preserve an objection and further that there is no need to preserve the record because on appeal the matter is tried anew. In prior opinions, this Court has required a party to preserve the right to appeal by making a contemporaneous objection in trial court. See State v. Greytak (1993), 262 Mont. 401, 865

8

P.2d 1096. However, we have required a party to preserve error for an appeal only when that party appeals from the district court to this Court. The rationale behind the requirement is to preserve the alleged errors on record, for a reviewing court to determine if the lower court did indeed commit error. In the instant case, the State had a statutory right of appeal from the dismissal of its case in Justice Court and the District Court was required to try the case anew. Therefore it was unnecessary for the State to preserve error by objecting to the dismissal at the Justice Court level.

Consequently, Romero's third contention, "invited error," also fails because the State did not appeal an error in the Justice Court but instead appealed for a trial de novo. Because a district court does not review either legal or factual determinations of the justice court, but must conduct a trial de novo, the doctrine of "invited error" does not apply in the instant case. Accordingly, we hold that the District Court correctly denied Romero's motion to dismiss the State's appeal from Justice Court.

2. Did the District Court deny Romero his right to a speedy trial?

Romero claims that the District Court denied him his constitutionally protected right to a speedy trial. The State argues to the contrary, asserting that Romero caused the delay and that he was not denied his right to a speedy trial. A speedy trial claim is a question of constitutional law. State v. Cassidy (1978), 176 Mont. 385, 388, 578 P.2d 735, 737. We review questions

9

of law de novo to determine whether the court's interpretation of the law is correct. Carbon County v. Union Reserve Coal Co., Inc. (1995), 271 Mont. 459, 469, 898 P.2d 680, 686; Steer, Inc. v. Department of Revenue (1990), 245 Mont. 470, 474-75, 803 P.2d 601, 603.

"Montana law requires a defendant who is charged with a misdemeanor to be brought to trial within six months after entry of plea." State v. Sunford (1990), 214 Mont. 411, 415, 796 P.2d 1084, 1086. Section 46-13-401(2)`, MCA, provides:

> (2) After the entry of a plea upon a misdemeanor charge, the court, unless good cause to the contrary is shown, shall order the prosecution to be dismissed, with prejudice, if a defendant whose trial has not been postponed upon the defendant's motion is not brought to trial within 6 months.

However, this six-month rule does not apply in circumstances where the defendant is tried in justice court and the judgment is appealed for trial de novo in district court. Sunford, 796 P.2d at 1086 (citing State v. Schnell (1939), 107 Mont. 579, 582, 88 P.2d 19, 20). "Once an action is appealed from justice to district court, it is treated as if it were a new trial." Sunford, 796 P.2d at 1087. Moreover, in State v. Crane (1989), 240 Mont. 235, 238, 784 P.2d 901, 903, this Court held that the statute and thus the six-month period does not apply to instances where the defendant caused the delay or requests a postponement.

This Court has held that where a defendant is tried in justice court within six months from the date of his or her initial appearance and "then appealed to district court for a trial *de novo*, § 46-13-401(2), MCA, was inapplicable to the proceedings in

10

district court, but that the time for conducting a trial in the district court is controlled by the criteria established in Barker v. Wingo (1972), 407 U.S. 514, 523, 92 S.Ct. 2182, 2188, 33 L.Ed.2d 101, 112-13." State v. Bullock (1995), 272 Mont. 361, 368, 901 P.2d 61, 66. Barker sets forth a four-part test to determine whether a court denied a defendant the right to a speedy trial. Those four criteria are: 1) the length of the delay; 2) the reason for the delay; 3) the assertion of the right by the defendant; and 4) the prejudice to the defense. Sunford, 796 P.2d at 1087 (citing Barker, 407 U.S. at 530); see also State v. Eklund (1994), 264 Mont. 420, 424, 872 P.2d 323, 325-26.

The first part of the test, the length of delay, is of primary importance. To determine the length of delay, this Court has looked to the overall time between the justice court order that allowed the State to appeal to district court and the commencement of the trial in district court. Sunford, 796 P.2d at 1087. Therefore, "the time for calculating the length of delay commences on the date that the State files its notice of appeal from justice court." Bullock, 901 P.2d at 67. We calculate this time period without regard to the reason or fault for the delay. Eklund, 872 p.2d at 326. The facts of each case dictate whether the length of delay is presumptively prejudicial. However, if the length of delay is over 200 days, the delay is presumptively prejudicial and requires further analysis. Eklund, 872 P.2d at 326.

In the instant case, the State filed its notice of appeal from Justice Court on November 30, 1993. The District Court initially

11

scheduled the trial for May 2, 1994. When, on April 25, 1994, the District Court orally denied Romero's motion to dismiss based on lack of a speedy trial, the scheduled trial was only 153 days from the date the State had filed its notice of appeal and 153 days is not presumptively prejudicial. See Bullock, 901 P.2d at 67 (176 days is not presumptively prejudicial); State v. Nelson (1991), 251 Mont. 139, 822 P.2d 1086 (165 days is not presumptively prejudicial). Notwithstanding, since Romero's trial was not actually held until 363 days from the date the State appealed, we must address the other three parts of the four-part test.

In considering the second part of this test, reason for the delay, we allocate the delay by determining the delay attributable to each party. State v. Matthews, (1995), 271 Mont. 24, 28, 894 P.2d 285, 287. In the instant case, the District Court charged the delay from April 25, 1994, to the trial date of November 28, 1994, to Romero. On April 25, 1994, Romero moved to dismiss the case and his motion required an extensive evidentiary hearing, preparation of transcripts, and additional briefing. Romero was not responsible for the first 146 days of delay, from November 30, 1993, to April 25, 1994. However, Romero's motion to dismiss caused the remaining 217-day delay. See State v. Weeks (1995), 270 Mont. 63, 72-73, 891 P.2d 477, 483. Moreover, Romero did not object to the District Court's order vacating the trial date and continuing the evidentiary hearing. The State neither requested a continuance nor filed any motions that delayed Romero's trial. In fact, the transcript indicates that the State was concerned about

12

ensuring that Romero received a prompt trial. Therefore, we conclude that the District Court properly allocated the 217-day delay to Romero.

Romero met the third part of the Barker test, assertion of the right to a speedy trial, by timely filing his motion to dismiss based on a lack of a speedy trial. In considering the fourth part of the test, prejudice to the defendant, this Court has identified three factors in determining prejudice: 1) prevention of oppressive pretrial incarceration; 2) minimization of the defendant's anxiety and concern; and 3) avoidance of impairment of the defense. Matthews, 894 P.2d at 288. Impairment of the defense is the most critical of these three factors.

Romero was not subjected to pretrial incarceration or arrest. While he contends that he suffered anxiety and concern, the record does not show that his anxiety and concern were a result of delay so much as a result of being charged, nor does the record show that he suffered undue anxiety or concern. Additionally, there is no evidence showing that the delay impaired his defense. All of Romero's witnesses testified and each claimed no loss of memory.

After applying the four-part Barker test, we conclude that the District Court correctly interpreted the law in denying Romero's motion to dismiss based on a lack of a speedy trial.

3. Did the District Court err in denying Romero's motion to dismiss based on his claim of outrageous government conduct?

Romero claims that the District Court erred in denying his motion to dismiss based on his claim of outrageous government

13

conduct. Specifically, Romero claims that Long's hunting, taking, and wasting game as part of his undercover operation constituted outrageous conduct that should have precluded the State from prosecuting him. The State contends that the District Court did not err because Long's behavior did not meet the standard of outrageous government conduct.

We review a district court's denial of a motion to dismiss to determine whether the district court's interpretation of the law was correct. State v. Bullock (1995), 272 Mont. 361, 368, 901 P.2d 61, 66.

The Due Process Clause of the Fifth Amendment prohibits a state's involvement in a criminal enterprise that is "so grossly shocking and so outrageous as to violate the universal sense of justice." United States v. Smith (9th Cir. 1991), 924 F.2d 889, 897; see also United States v. Russell (1973), 411 U.S. 423, 431-32, 93 S.Ct. 1637, 1642-43, 36 L.Ed.2d 366, 373. In a 1986 case, the Ninth Circuit Court of Appeals stated:

> [in addition to police brutality] We have held that law enforcement conduct also becomes constitutionally unacceptable "where government agents engineer and direct the criminal enterprise from start to finish,". . . or when governmental conduct constitutes "in effect, the generation by police of new crimes merely for the sake of pressing criminal charges against the defendant."

United States v. Bogart (9th Cir. 1986), 783 F.2d 1428, 1436, *vacated on other grounds sub nom. United States v. Wingender (9th Cir. 1986), 790 F.2d 802.* However, the doctrine is a "most narrow" defense. State v. Briner (1992), 253 Mont. 158, 164, 831 P.2d 1365, 1369. Therefore, the protection afforded by the Due Process

14

Clause applies only when "the Government activity in question violates some protected right of the *defendant*." State v. Haskins (1992), 255 Mont. 202, 208, 841 P.2d 542, 546 (quoting Hampton v. United States (1976), 425 U.S. 484, 490, 96 S.Ct. 1646, 1650, 48 L.Ed.2d 113, 119).

In its findings of fact, conclusions of law and order, the District Court noted that if Romero was not the focus of the investigation and became involved because Hugs asked him, he may not have standing to raise a claim of outrageous government conduct. The District Court cited to Bogart, where the Ninth Circuit Court of Appeals held that two parties that were not targets of the government's conduct did not have standing to raise a due process violation suffered by the third party that was the target of the investigation. Bogart, 783 F.2d at 1433 (this opinion was later vacated and remanded when one of the parties, Wingender, petitioned for rehearing on the basis that the government had targeted him along with Bogart, thus giving Wingender standing to raise an outrageous government conduct claim); United States v. Emmert (9th Cir. 1987), 829 F.2d 805 (holding that co-defendant lacked standing to object to the government's activities in this case since he was never an actual target of the investigation).

Similarly, Romero was never the focus of the undercover operation. The transcript in the instant case indicates that the undercover operation focused on Hugs and that the investigation involved Romero only because Hugs included Romero on the hunts.

15

The evidence does not establish that the State targeted Romero in its investigation. Accordingly, we conclude that the District Court correctly denied Romero's motion to dismiss because Romero lacked standing to raise a claim of outrageous government conduct. Moreover, there is no evidence that the State engineered the criminal enterprise in which Romero was involved or generated crimes merely for the sake of prosecuting him. Accordingly, Romero's outrageous government conduct claim must fail.

4. Did the District Court abuse its discretion in denying Romero's motion to dismiss based on an alleged discovery violation?

Romero claims that the State refused to provide him with an unedited copy of the videotape of the May 9, 1993 hunt, and therefore, the District Court erred in denying his motion to dismiss based on a discovery violation. The State contends that Romero's motion is without merit. Again, we review a district court's denial of a motion to dismiss to determine whether the district court's interpretation of the law was correct. State v. Bullock (1995), 272 Mont. 361, 368, 901 P.2d 61, 66.

Section 46-15-322, MCA, allows a prosecutor to impose reasonable conditions on the disclosure of physical evidence. Section 46-15-322, MCA, provides the following:

> (1) Upon request, the prosecutor shall make available to the defendant for examination and reproduction the following material and information within the prosecutor's possession or control:
> . . .
> (d) all papers, documents, photographs, or tangible objects that the prosecutor may use at trial or that were obtained from or purportedly belong to the defendant; and
> . . .

16

(3) The prosecutor may impose reasonable conditions, including an appropriate stipulation concerning chain of custody, to protect physical evidence produced under subsection (1)(d).

However, "[s]uppression of evidence by the State of facts that would be favorable to the defendant constitutes a violation of defendant's due process rights." State v. Gollehon (1993), 262 Mont. 1, 13, 864 P.2d 249, 257 (citing Brady v. Maryland (1963), 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215). The State must intentionally or deliberately suppress this evidence, or "Brady Material," for the suppression to be a due process violation per se. Gollehon, 864 P.2d at 257.

In the instant case, Romero requested information, including the videotape, concerning the activities of Long. The State originally refused to provide this information. Romero claims that the State's failure to initially provide Romero with the videotape and then only in an edited version, particularly when it introduced the subject of Long's professional record, violated Romero's due process rights. In summary, Romero contends that by editing the videotape, the State suppressed evidence that would have been favorable to Romero.

The State counters that Romero failed to show that the State failed to provide exculpatory evidence. In fact, the State claims it fulfilled its obligations under § 46-15-322, MCA, by allowing Romero's counsel to view the unedited tape. There is no evidence that the State tampered with the tape. Rather, the State showed that Long's safety was at risk while he was still in an undercover capacity.

17

Romero also objects to the order permitting his expert to independently examine the videotape because the hearing had already ended. However, Romero does not even now suggest that in his expert's opinion, the State tampered with the tape. Moreover, if Romero had evidence of tampering, he could have requested that the District Court reopen the hearing. Romero did not present evidence of tampering, nor did he request the hearing reopened. Because Romero presents no evidence that the State committed a discovery violation, the District Court correctly denied Romero's motion to dismiss. Accordingly, we conclude that the District Court did not abuse its discretion in denying Romero's motion to dismiss based on an alleged discovery violation.

5. Did the District Court abuse its discretion when it denied Romero's motion to exclude testimony of Officer Long based on the State's refusal to produce Long's file?

Romero contends that the District Court erred in denying his motion in limine and in allowing Long to testify when the State had not produced his personnel file. Romero requested Long's personnel file and his monthly activity reports. On September 6, 1994, the deputy county attorney advised Romero that he would not provide the personnel file. Romero did not seek to compel the production of the file but instead filed a motion in limine on November 21, 1994.

We review a district court's discretionary ruling such as admission of evidence for an abuse of that discretion. State v. Burns (1992), 253 Mont. 37, 42, 830 P.2d 1318, 1322.

18

Section 46-15-322(5), MCA, governs the procedure for the prosecution to disclose discovery. Section 46-15-322(5), MCA, provides the following regarding information for which the defendant shows he has substantial need:

> (5)   Upon motion showing that the defendant has substantial need in the preparation of the case for additional material or information not otherwise provided for and that the defendant is unable, without undue hardship, to obtain the substantial equivalent by other means, the court, in its discretion, may order any person to make it available to the defendant. The court may, upon the request of any person affected by the order, vacate or modify the order if compliance would be unreasonable or oppressive. The prosecutor may not be required to prepare or disclose summaries of witnesses' testimony.

In the instant case, the District Court advised Romero that § 46-15-322(5), MCA, requires that Romero apply for and secure a court order compelling discovery of Long's personnel file. Romero did not file a motion with the District Court for production of the personnel file. Had Romero moved for production of discovery, the District Court could have analyzed whether Romero had a substantial need for the information.

We conclude that Romero failed to move the District Court for production of the information and failed to demonstrate a basis for obtaining Long's personnel file. Therefore, the District Court appropriately denied Romero's motion in limine made shortly before trial in an effort to prevent Long from testifying.

6.   Did the District Court abuse its discretion in denying Romero's motion to prohibit the State from introducing exhibits at trial based on an alleged discovery violation?

19

Romero contends that the District Court erred in denying his motion to exclude a photograph of him with a dead elk and records demonstrating a past suspension of his hunting license. Romero argues that this evidence was prejudicial and that the State was required to notify him that it would introduce those items as exhibits. The State counters that it provided Romero with these items when it produced its discovery and that the State is not required in discovery to list the specific items it will seek to introduce at trial.

Rulings on admissibility of evidence are left to the sound discretion of the trial court. State v. Stringer (1995), 271 Mont. 367, 374, 897 P.2d 1063, 1067. We review a district court's evidentiary rulings to determine whether the court abused its discretion. State v. Gollehon (1993), 262 Mont. 293, 301, 864 P.2d 1257, 1263.

Section 46-15-322(1)(d), MCA, governs the information the prosecutor is required to make available to the defendant. Specifically, § 46-15-322(1)(d), MCA, provides:

> (1) Upon request, the prosecutor shall make available to the defendant for examination and reproduction the following material and information within the prosecutor's possession or control:
> . . .
> (d) all papers, documents, photographs, or tangible objects that the prosecutor may use at trial or that were obtained from or purportedly belong to the defendant....

In the instant case when the State did not provide a list of the specific exhibits it intended to offer into evidence at trial, Romero moved to exclude a photograph and a document showing a past suspension of his hunting license. The District Court denied both

20

motions. Section 46-15-322(1)(d), MCA, requires the State to make available all documents and photographs that it "may" use at trial. In this case, the State did so. The statute does not require the State to specify which of the documents produced in discovery it will introduce at trial and the State has no obligation to introduce all or any of the documents simply because of its obligation to produce them. Accordingly, we hold that the District Court did not abuse its discretion in denying Romero's motion to exclude evidence.

7. Did the District Court err in denying Romero's motion for a mistrial or dismissal of the charges based on an alleged discovery violation?

Romero claims that the State violated the discovery statute, § 46-15-322(1)(b), MCA, by not disclosing Officer Scott's testimony that Romero confessed to the charges and that the District Court erred by not granting a mistrial based on this testimony. The State argues that Romero did not establish a discovery violation and further that he failed to show that there was a "manifest necessity" to declare a mistrial.

The standard of review for denial of a motion for a mistrial is whether there is clear and convincing evidence that the district court's ruling is erroneous. State v. Greytak (1993), 262 Mont. 401, 404, 865 P.2d 1096, 1098. Moreover, a motion for a mistrial will be granted only when there is either a demonstration of manifest necessity, or where the defendant has been denied a fair

21

and impartial trial. State v. Ford (Mont. No. 95-158, decided October 17, 1996), Slip op. 9.

Section 46-15-322(1)(b), MCA, the discovery statute, provides in part:

> (1) Upon request, the prosecutor shall make available to the defendant for examination and reproduction the following material and information within the prosecutor's possession or control:
> . . .
> (b) all written or oral statements of the defendant and of any person who will be tried with the defendant...

In this case, the State did not provide Romero with the statements that Romero allegedly made to Officer Scott confessing to the crimes charged. Therefore, Officer Scott's testimony regarding Romero's confession surprised Romero at trial. However, on cross-examination, Romero's counsel revealed that Romero had not literally confessed, but that Officer Scott merely inferred that Romero had confessed. A portion of the cross-examination follows:

Q. [Romero's counsel] Is that your report?

A. [Officer Scott] Yes, that's a copy of that transcribe interview.

Q. Can I look at it? I was looking for it in there and I couldn't find it. There's nothing in this report that says that Aaron Romero admits to any of these violations, is there?

A. Nothing on tape, counselor.

Q. Nothing on tape and nothing in the report, is there?

A. This isn't my--this isn't my report. This is a brief of the taped interview and my involvement with the case.

Q. That's the only thing that I've got in this case that you've said. Is there something else?

A. No, this is it. My recollections of Mr. Romero's conversation with me on August 5th was that he admitted

22

to the event that he was alleged to have committed on the complaints, and that's what my answer was, counselor.

Q.     Well, then why didn't you record it--write it-- report that in your report?

A.     I don't know.  It certainly would indicate to me that it's --it's assumed that he admitted to that in my reports.

Q.     I don't understand that.  You're saying that--this report is all that you have of your recollection of the events that occurred on August 5th, 1993; isn't that true?

A.     That's true.

Q.     And not once in there, either in the tape-recorded portion or in the part that you wrote of your recollection of the events, is there any indication that Aaron Romero admitted to these five Fish and Game violations, is there?

A.     I believe what I was referring to, Mr. Sands, is that in my report where I advise in here that he was explained the process and the NTA --the NTAs were explained to him, and the NTA's were in reference to the fact that those were, in fact, true, yes.

Q.     That doesn't say that.

A.     Well, that's what I indicated in my report, sir.

Q.     Where did you indicate that?

A.     When I refer to that he was--

Q.     Read it to me.

.  .  .

A.     The procedure to make an appearance before the judge in Big Horn County, the appearance dates and some times the judge hears appearance.  Romero acknowledges that.  He said he would enter a plea the following week.  Says Aaron Romero had moved here recently from California.  Said his dad would make payments for the fines and at least make time payments on those fines.  Now, if he's indicating he was going to pay the fine, counselor, I would indicate that that admits guilt. That's what I'm referring to.

Q.     I'm asking you to read me the parts that you say where he admitted to this.

A.     I just did.  Said--

23

Q.   And that's it?

A.   His father would make payments for his fines and would at least make time payments on the fines.

. . .

Q.   You're just saying that you inferred--or you assumed--

A.   Yes, sir.

Q.   --because he made some reference to his father maybe helping pay some fines that he might--that he was pleading guilty to all of them?

A.   That's correct.

Based on this discussion, the District Court correctly found that any prejudice from Officer Scott's testimony was removed by Romero's counsel through cross-examination. Moreover, the report from which Officer Scott made the inference of a confession was available to Romero in pretrial discovery and Romero did not make a contemporaneous objection to Officer Scott's testimony at trial. Consequently, we conclude that Romero failed to meet his burden of showing clear and convincing evidence of error by the District Court.

Accordingly, we hold that the circumstances of this case did not warrant a mistrial and the District Court did not err in denying Romero's motion.

8.   Did the District Court err in permitting the State to amend the citations after trial had started?

In its notice to appear and complaint, the State charged Romero with five misdemeanor offenses. Three of the complaints cited to the wrong statutes. The District Court permitted the State to amend the citations to reflect the correct statutory

24

sections. However, Romero claims that the District Court erred in allowing the State to amend the citations and should have dismissed the charges based on the incorrect citations.

We have held that "when the facts, acts and circumstances are set forth with sufficient certainty to constitute an offense, it is not a fatal defect that the complaint gives the offense an erroneous name." State v. Collins (1987), 226 Mont. 188, 191, 734 P.2d 686, 688-89. Similarly, an erroneous statutory reference will not invalidate a charge. Collins, 734 P.2d at 689. In Collins, the State erroneously cited to § 61-5-212, MCA, in the information. However, the facts and circumstances described in the same information unmistakably alleged a violation of § 61-11-213, MCA. This Court reiterated that the specific acts charged and not the name of the statute control.

In State v. Later (1993), 260 Mont. 363, 860 P.2d 135, the information alleged that the defendant committed official misconduct in violation of § 7-4-2511, MCA, and § 7-32-2144, MCA. However, when the parties settled the jury instructions, the State conceded that § 7-4-2511, MCA, and § 7-32-2144, MCA, had been cited in error and that § 7-32-2143, MCA, was the applicable statute. We held that the amendment was one of substance, because it substantially altered the underlying offense. We clarified that our decision did not dilute the principle that an erroneous statutory reference will not invalidate the charge. Later, 860 P.2d at 137.

In the instant case, the complaint erroneously cited to the penalty statutes rather than the substantive statutes. However, the facts clearly set forth that Romero was charged with hunting elk, bear, and antelope while his privileges were suspended. The complaints correctly named the offense, but incorrectly cited the penalty statutes rather than the substantive statutes. The amendments to the citations did not prejudice Romero's substantial rights because the complaints clearly established the facts and acts for which Romero was charged. Because the complaints described and gave notice of the offenses, we hold that the District Court did not err when it permitted the State to amend the citations.

Affirmed.

_____
Justice

We Concur:

_____

_____
Justices

26

Justice W. William Leaphart, specially concurring.

I concur with the Court's opinion. I write separately to elaborate on what I see as the proper application of the new standard with regard to reviewing motions for mistrial. Recently, in State v. Ford (No. 95-158, decided October 16, 1996), we straightened out some twenty years of confusion as to the proper standard for reviewing district court rulings on motions for a mistrial. In Ford, relying on United States v. Perez (1824), 22 U.S. (9 Wheat) 579, 580, 6 L.Ed. 165, we held that a motion for a mistrial should be granted when there is either a demonstration of manifest necessity or where the defendant has been denied a fair and impartial trial. I agree entirely with that statement. However, since Perez is the source of the standard, it is essential to put the manifest necessity component of that standard in context of the Perez decision.

In Perez, the Court stated:

the law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated.

Perez, 22 U.S. at 580 (emphasis added).

It is important to recognize three aspects of the Perez decision: (1) It involved a double jeopardy analysis; (2) the mistrial was declared by the court, not requested by the defendant; and (3) the mistrial was declared due to a hung jury, i.e., it was not the result of fault of either party or the court.

27

In the years since Perez, the United States Supreme Court has restricted the manifest necessity portion of the Perez standard to situations in which the court declares a mistrial without the consent of the defendant. In United States v. Dinitz (1976), 424 U.S. 600, 606-07, 96 S.Ct. 1075, 1079, 47 L.Ed.2d 267, 273 (relied on by this Court in Keating v. Sherlock (Mont. 1996), ____ P.2d ____, 53 St.Rep. 855), the Court held the following:

> this Court has held that the question whether under the Double Jeopardy Clause there can be a new trial after a mistrial has been declared without the defendant's request or consent depends on whether "there is a manifest necessity for the (mistrial), or the ends of public justice would otherwise be defeated." [Citations omitted.] *Different considerations obtain, however, when the mistrial has been declared at the defendant's request.* [Citation omitted; emphasis added.]

The Court has applied a different standard when the mistrial is at the behest of the defendant. In Oregon v. Kennedy (1981), 456 U.S. 667, 672, 102 S.Ct. 2083, 2087-88, 72 L.Ed.2d 416, 422, the Court held the following:

> Where the trial is terminated over the objection of the defendant, the classical test for lifting the double jeopardy bar to a second trial is the "manifest necessity" standard first enunciated in Justice Story's opinion for the Court in *United States v. Perez* [citation omitted]. *Perez* dealt with the most common form of "manifest necessity": a mistrial declared by the judge following the jury's declaration that it was unable to reach a verdict. While other situations have been recognized by our cases as meeting the "manifest necessity" standard, the hung jury remains the prototypical example. [Citations omitted.] The "manifest necessity" standard provides sufficient protection to the defendant's interests in having his case finally decided by the jury first selected while at the same time maintaining "the public's interest in fair trials designed to end in just judgments." [Citation omitted.]
> *But in the case of a mistrial declared at the behest of the defendant, quite different principles come into*

28

play. Here the defendant himself has elected to terminate the proceedings against him, and the "manifest necessity" standard has no place in the application of the Double Jeopardy Clause. [Citing *Dinitz*; emphasis added.]

The Court in *Dinitz* had set out the rule to be applied when a defendant requests the mistrial:

> [Where] circumstances develop not attributable to prosecutorial or judicial overreaching, a motion by the defendant for mistrial is ordinarily assumed to remove any barrier to reprosecution.

*Dinitz*, 424 U.S. at 607 (quoting United States v. Jorn (1971), 400 U.S. 470, 485, 91 S.Ct. 547, 557, 27 L.Ed.2d 543, 556).

In *Kennedy* the Court elaborated on the exception to the rule that a defendant's motion for mistrial ordinarily does not bar retrial.

The exception arises when the prosecutor's actions giving rise to the defendant's mistrial motion were done "in order to goad the [defendant] into requesting a mistrial." *Kennedy*, 456 U.S. at 673 (citing *Dinitz*).

Although it is appropriate for a court to declare a mistrial when there is manifest necessity (hung jury, sick juror, etc.), it would not be appropriate to hold a defense motion for a mistrial to a "manifest necessity" standard. The manifest necessity portion of the *Perez* standard has no application to defense motions for mistrial. Independently of manifest necessity, a defense motion should be granted where the ends of public justice so require or where the defendant will be denied a fair and impartial trial. It would be error to deny a defense motion for mistrial for failure to satisfy the higher manifest necessity standard.

29

Although we have adopted a standard which sets forth two disjunctive components (manifest necessity *or* denial of fair and impartial trial), it should be recognized that a district court cannot randomly pick which alternative to apply to a particular case. The choice of the appropriate standard will hinge upon whether the defense requests the mistrial or whether the court, *sua sponte*, declares the mistrial. The manifest necessity standard will only have application in situations where the court, due to a hung jury or a sick juror, for example, declares a mistrial.

In situations such as the present case, where defendant Romero moved for a mistrial, the appropriate inquiry is not whether manifest necessity existed, but rather whether the circumstances alleged as the basis for the mistrial would deny Romero a fair and impartial trial.

_____
Justice

Justices James C. Nelson, Karla M. Gray and Charles E. Erdmann join in the foregoing special concurrence.

_____
Justices

30

Justice Terry N. Trieweiler concurring in part and dissenting in part.

I concur with the majority's conclusions in response to Issues 1, 3, 4, 5, 6, and 8. I dissent from the majority's resolution of Issues 2 and 7.

I dissent from the majority's conclusion that Aaron D. Romero was not denied a speedy trial for the same reason that I specially concurred in this Court's decision in *State v. Mantz* (1994), 269 Mont. 135, 139, 887 P.2d 251, 254 (Trieweiler, J., and Hunt, J., specially concurring). Romero was charged with misdemeanor offenses in Justice Court on August 5, 1993, and entered his plea on August 9, 1993. The charges against him were dismissed in Justice Court on November 30, 1994, and the State appealed to the District Court on that date. From the time of appeal until the time of Romero's trial in District Court, 363 days passed. After appeal, no extension was ever requested by Romero. Section 46-13-401(2), MCA, requires that people charged with misdemeanors be brought to trial within six months. It does not make a distinction between pretrial delay in justice court and pretrial delay in district court. As I previously stated in *Mantz*, "[t]hat fictional distinction was created by this Court in *State v. Sunford* (1990), 244 Mont. 411, 796 P.2d 1084, by sheer judicial legislation. Therefore, I decline to follow that decision." *Mantz*, 269 Mont. at 139, 887 P.2d at 254.

31

My position has not changed. Although I agreed in *State v. Bullock* (1995), 272 Mont. 361, 369, 901 P.2d 61, 67, that there was no basis for distinguishing between cases that come to district court following trial in justice court, and those cases that come to district court following some other disposition in justice court, that is not the issue presented in this case. Therefore, I restate my objection to this Court's amendment of § 46-13-401(2), MCA.

I also conclude that the District Court erred when it denied Romero's motion for a mistrial based on the State's failure to comply with the plain terms of § 46-15-322(1)(b), MCA, which required that in response to the defendant's request the State produce all written or oral statements that the defendant had made.

In addition to § 46-15-322(1)(b), MCA, the State was required by the District Court's March 28, 1994, omnibus order to provide the defendant with copies of any statements he had made. None were provided. Neither was there any suggestion that the defendant had made a confession in either the State's trial brief or the State's opening statement. Then, after calling Warden Jeff Scott as its witness, the State elicited the following testimony from Scott:

Q.    Okay.  Did he admit to you at any time either on tape or off tape the hunting violations?

A.    Yes, he did off tape.

Q.    How did he--what did he say to admit?

A.    He indicated that he was certainly involved in the elk and the antelope or deals that were alleged to have been committed on the reservation, and that he wouldn't indicate to his involvement as far as the actual killer or the killing shots that killed some of the elk that

32

were alleged to have been killed on the reservation, but he indicated that he was shooting at them.

. . . .

Q. Did he admit or deny hunting bear while he was suspended?

A. He admitted to that.

Q. Did he admit or deny hunting elk while his privileges to hunt were suspended?

A. He admitted to that as well.

Q. Did he admit or deny wasting elk carcass?

A. He admitted to that as well.

Q. Did he admit or deny wasting antelope carcass?

A. He admitted to that as well.

Q. Did he admit or deny hunting an antelope while his privileges were suspended?

A. He admitted to that as well.

Q. Did he appear to understand what you were talking to him about?

A. Yes, sir, he did.

Q. Did he appear to be under the influence of any intoxicating substance or chemical at that time?

A. No, sir, not to me he didn't.

Q. Any reason to believe in your mind that he didn't understand what you were talking to him about?

A. No, sir.

Q. Did he, at any time during your conversation with him that day, offer to you the excuse that someone else had made him do what he was charged with doing?

A. No, sir.

33

We recently held in *State v. Ford* (Mont. 1996), 53 St. Rep. 947, 950, that a mistrial is appropriate when there is a "demonstration of manifest necessity *or* when the defendant has been denied a fair and impartial trial."

Romero was clearly denied a fair trial when the State inferred prior to trial that he had made no confession of guilt and then called a law enforcement officer who stated unequivocally at trial that Romero had admitted guilt to all of the violations with which he was charged.

While the majority winks at this gross violation of pretrial discovery rules based on concessions made by the State's witness during cross-examination, the concessions were anything but unequivocal. That part of Scott's testimony, which is referred to in the majority opinion, continued with the following argumentative responses:

Q. That is nothing more than your assumptions based on an inference; is that true?

A. Based on experience.

Q. Based on an inference; is that true?

A. Inference with experience, counselor.

Q. And Aaron Romero never admitted to you those--that he's guilty in those offenses?

A. Not in those exact words.

In other words, in spite of the fact that Scott was called to testify unequivocally that Romero had previously admitted guilt, and in spite of the fact that the State had refused to disclose

34

this alleged admission of guilt prior to trial, in violation of statute and the court's orders, and in spite of the further fact that *Scott* apparently had no factual basis for his misrepresentation, he still left the jury, following cross-examination, with the inference that an admission had been made. Romero had no opportunity to prepare for or respond to this critical testimony, and no other conclusion can be drawn than that on this basis he was denied a fair and impartial trial.

The majority states that "the report from which Officer Scott made the inference of a confession was available to Romero in pretrial discovery." However, there was nothing in the report to which the majority refers which even remotely suggested that the State would contend that Romero made a confession of guilt.

For these reasons, I dissent from the majority's conclusions which resolved Issues 2 and 7. I would reverse the judgment of the District Court.

_____
Justice

35

November 6, 1996

CERTIFICATE OF SERVICE

I hereby certify that the following certified order was sent by United States mail, prepaid, to the following named:

Jack E. Sands
Attorney At Law
100 North 27th, Suite 250
Billings MT 59101

Hon. Joseph P. Mazurek, Attorney General
Cregg Coughlin, Assistant Attorney General
215 N. Sanders
Helena MT 59620

Curtis L. Bevolden
Big Horn Deputy County Attorney
Box H
Hardin MT 59034

ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY:_____
Deputy